I understand that Attorney Watterson is here, so that's great, and we will then call the calendar in order. The first case on is Dickens v. Hudson Sheraton Corporation. May it please the Court, Ambrose Watterson for the appellant. The issue in this case is whether or not acts of coercion and intimidation during the course of a resolution process, an internal resolution process, can constitute acts of retaliation. The facts in this case are fairly simple and fairly straightforward. Dating back as far as 2003, Mr. Dickens had been subjected to discriminatory ridicule, horseplay, and had been passed over because of his age. At least that's what he had alleged. But more particular, in 2005, April 2005, as part of this atmosphere of ridicule, he was falsely accused of taking a knife or allegedly a boxcutter to a fellow employee. That turned out to be completely false, and in fact, there was a letter written in Spanish which made the allegation, but when the letter was translated from Spanish to English, it said no such thing, made no such mention of a knife or a boxcutter. It wasn't translated. I'm sorry, Your Honor. It wasn't translated. It was. It was translated, but my client didn't have a copy of that contemporaneously. At some point, he did get a copy of it, and it was clear that there was no boxcutter or knife. In any event, critically, at some point, the accuser, Mr. Trinidad, told my client, and this is in our briefs, that I agree no such thing occurred. I sort of made that up, and I was put to that by the main supervisor. Was there an adverse employment action taken as a result of that meeting in November? Our position is that he continued to be passed over. Unfortunately, the court below didn't The bartending position? Correct. Unfortunately, the court below did not find that and claim that there wasn't enough evidence that he was actually passed over. My understanding is that he hadn't served as a bartender since 2015, something like that? That's incorrect. We actually disputed that in our papers and in Mr. Dickens' affidavit. That was 2005, right? That's correct, Your Honor. That's correct. In Mr. Dickens' affidavit, he said he had continuously complained about being passed over and not being allowed to continue working as a bartender. How can that be retaliation for something that happened at that meeting? If he's already been passed over and has been complaining about being passed over for years, what's the new thing that happens to him? I agree, Your Honor. The new thing was not necessarily his being passed over. The new thing was for at least since 2005, he says he was continuously passed over. He was also subjected to discriminatory ridicule, horseplay, touching the buttocks and whatnot. But importantly, the notion that he had taken a knife to somebody, continued to be part of this atmosphere. This was a meeting where finally the parties were going to get together. Mr. Trinidad was going to say, no, that didn't occur. I was put up to this by your supervisor, and here's the supervisor. That was the new piece. The new piece was finally this man was going to get an opportunity to clear his name. Finally, there was going to be some real exculpatory evidence. Wait, but Trinidad said at an earlier time, falsely, according to his later testimony, that this knife incident did happen, right? Correct. So then he recants and says it didn't happen. Correct. Then there's a meeting. At that meeting, the supervisor says, in effect, didn't you say before? Aren't you now contradicting what you said before? Yes and no. I think the subtlety is important here because in Mr. Dickinson's affidavit, he says the supervisor got in Trinidad's face and in an intimidating manner said, didn't you say this before? Why is that retaliation? Isn't that what happens at a trial or hearing or some effort to get at what really occurred, that the person is confronted with his prior inconsistent statement? The meeting ended shortly thereafter. In this context, and I agree, typically at trials you have cross-examination, but in this particular context where it's on the job and where people are subjected to intimidation, this gentleman didn't even get a chance to speak. He didn't go on the record, as it were, and say, by the way, this didn't happen. Before he could even say anything, the supervisor gets in his face in an intimidating, physically intimidating manner and says, didn't you write this? And importantly, Trinidad responds, I don't recall that. Now how is that? So he did get a chance to say something then. In response. What I'm puzzled about is why is this retaliation? How does this count as retaliation for a complaint if what happened is there's an argument about whether the complaint is valid? Well, Your Honor. And maybe it was decided wrong, or I don't know what happens at the end of the hearing, but why does that constitute retaliation? And why is that an adverse action against Mr. Dickens? We had to respectfully borrow, and we are suggesting that this Court of Appeals consider this, we did have to borrow from the New York City anti-discrimination statute that talks about coercion and intimidation. And our position is we can't have a situation going forward if this Court were to rule against us where there is intimidation at a meeting of this sort. Was the question of interference with a complaint as opposed to retaliation for a complaint raised in the district court? It was raised in the briefing. It was raised in the briefing as a form of retaliation. And importantly, the district court did not address that at all. And that's another reason why we think that this court would be a good place for this. Now, is there such a thing as an interference claim under Title VII or the ADEA? There is under the Family and Medical Leave Act a separate issue of whether the employer interferes with the ability to take FMLA leave. But there doesn't seem to be similar language in either of those statutes. Your Honor, we will freely concede, and that's why there aren't any cases that are in our brief other than a recitation to the New York City Human Rights Code. It's our position that looking at the context, this court can read that because we are concerned that going forward Just as far as the New York City Act is concerned, am I right that Mr. Dickens didn't make any claims under the New York City law? He did. They were dismissed. They were dismissed. And is that because he had taken these to the Human Rights Commission and he was precluded from raising those in court? That's correct, Your Honor. That's correct. And again, so that provides another important context here, that we understand this procedurally. But importantly, again, going forward, should we have a situation where a person avails himself of the internal resolution procedures, there are acts of intimidation, and that's okay. I don't think that's okay. If the court has no further questions, I will rely on the brief, and I did reserve some time for rebuttal, but I'll let my colleague speak. Thank you.  Mr. Barrett, Your Honor. Mr. Metz. May it please the Court. The district court here aptly attempted to sort through the hodgepodge of allegations of age discrimination, of racial discrimination, of retaliation, and construct as best it could a theory under which plaintiff might possibly be articulating a claim. But even under the best of scenarios, the district court concluded there was no claim to be found here on its decision for summary judgment. And we submit the decision of the court was correct. As to discrimination, the court correctly found that there was no inference of racial or age bias that could be found in the record. Well, apparently that's all abandoned now, right? I mean, all that's being argued here is this interference-slash-retaliation issue, so why don't we move on from that? Correct, Your Honor. Correct. As to the retaliation claim, I think it's important to, first of all, try and separate out what's going on time-wise here. We're talking about things that happen over a period of 10 or more years. And as the district court correctly noted, the gaps in time between these events strongly suggest that there's no retaliation going on for events that happened so far back in the past. When we reach the point of November 2013 and the meeting, I think the first thing to point out here is that the story that wells up from the appellant is one that, at bottom, has no basis in fact. What's being claimed here is that there is intimidation based upon a of these things. I should point out, first, there is no affidavit or sworn testimony from Mr. Trinidad in this case and would not be at trial because of discovery failures by the appellant, which led the judge below to preclude him from putting in any witnesses other than Mr. Dickens himself. Therefore, there is no possibility that Mr. Trinidad at trial will do anything to say that there was a recantation or anything else. The only thing we have in the record is a supposed note by Mr. Trinidad that has never been authenticated, put in only under a declaration from appellant's counsel with no authentication whatsoever, which does not mention a box cutter or knife, but does mention a threat by Mr. Dickens to take someone outside. And the point here is that the 2013 meeting was simply about whether or not the 2005 notation in the record that Mr. Dickens voluntarily submitted to anger management counseling would be expunged from his record. There was sufficient basis You have an affidavit from Mr. Dickens about what was said, right? I'm sorry, Your Honor. There was an affidavit by Mr. Dickens in which he recounts what happened and what Matusas said to Trinidad. Yes, Your Honor, there was.  Well, You have to have Trinidad's statement. The evidence of Trinidad's statement would be here, say, Your Honor. The evidence as to Mr. Dickens' statement would be admissible, but that doesn't make the case that he needs to make. But you can certainly recount the conduct that occurred at that meeting, right? Yes, Your Honor. But now the point as to the conduct is that, first of all, union representative is at the meeting. There is no allegation by the union representative, by Mr. Dickens at the time. There is no appeal from that decision as to improper conduct being taken. Moreover, there is no evidence. Let's follow through on what Judge Lynch brought up earlier, which is it may have had a chilling effect on what he was going to do in the future if you get threatened by your supervisor or someone else gets threatened at a meeting you're present at. Wouldn't that deter you from filing claims in the future? And if so, isn't that actionable as some kind of retaliation or discrimination? Your Honor, I think that the case law in this circuit is fairly clear that in order for such an action to constitute in and of itself a violation, it has to be so pervasive, it has to be so chilling as to rise to the level of a per se violation. And I haven't seen in the case law of this circuit anything which suggests that the activity, which is alleged by Mr. Dickens here, rises to that level, but merely a questioning of a witness as to a supposed recantation. Moreover, it's important to note that there is no evidence whatsoever of an adverse employment action. By plaintiff appellant's own admission, the thing that he was not doing after 2013, bartending, is something that he hadn't done since 2005. And the only evidence in the record as to bartending was put in by the appellees in this case. And that evidence is that, first, Mr. Dickens was not certified to do bartending work under the procedures established in the collective bargaining agreement. If he did any bartending work, it would have been a violation of the collective bargaining agreement, and the hotel's records show that he made $36 in bartending income in 2004, and that is it. As Mr. Matus has testified, if he'd realized that that had been done, he would have had to have reported it to the court. There is no being passed over here. There is no being denied an employment opportunity. Mr. Dickens was not eligible for the bartending work in the first place, which goes to the McDonnell-Douglas framework, whether someone was eligible for the position. Moreover, there can be no causal connection here, because if he could not get the bartending work, there couldn't be any connection between the supposed retaliation and the supposed adverse employment action. I think, Your Honors, that that covers pretty much everything that remains in this case. No, I think there's one thing which remains to be said, and that's the question of credibility that needs to be given to the retaliation here. We're talking about a complaint which alleges age discrimination, racial discrimination, and a policy of retaliation, supposedly commencing in 2001 and going on to 2014, for different purposes, and it switches as you go through the complaint and through Mr. Dickens' affidavit. The question of whether it is credible at this point, whether an inference can be drawn that in 2013, all of a sudden, Mr. Matusas takes this retaliatory act when Mr. Dickens has received all salary and benefits that were to be accorded to him under the collective bargaining agreement, and when he was not denied any opportunity that he was eligible for, suggests to me that the fairest inference that can be drawn on this record is that there was, in fact, no retaliation, that there was, at best, in the 2013 meeting, an attempt to find out whether or not the record of 2005, eight years previously, should be expunged, and the hotel was in a position where it simply said, on this record, we can't expunge something that happened eight years ago without sufficient evidence. There's no reason to disturb the decision of the district court granting summary judgment to the defendants in this case. Thank you, Mr. Matusas. Mr. Watterson. Yes, Your Honor. I, Your Honors, addressing the very last point as to credibility, the record is also very clear that Mr. Dickens had, at least since 2003, continuously filed EEOC claims, State Division of Human Rights claims, and internal claims, and the November 13 meeting was an attempt, perhaps a final one, to try to get some clarity and to try to end what was happening, because by then, he correctly had concluded that anything internal wasn't working, and this was an opportunity where he had, where Mr. Trinidad would be able to address this directly. So, there had been a long-standing history of his trying to resolve this, cases getting dismissed as State Division of Human Rights, EEOC, and no action being taken internally. But they were not all related to the Trinidad situation. That's correct, Your Honor. Sex harassment charges, there was a supply room non-promotion charge. I mean, they were unrelated to this incident, right? They were unrelated, but they all appear to come out of when he was passed over the first time, and then there was an atmosphere of, you know, ridicule, you know, touching the buttocks, joking, and things of that sort. And we contend that that was also related to an ongoing claim of age discrimination. He complained about age discrimination fairly early, but was not able to get any justice. So, again, in that context, of all these complaints, of this long-standing effort to get justice, that's why this final meeting was very critical. Maybe, we can't, you know, we can't figure out what would have happened after that, but that may have been sufficient for Mr. Dickens in that context, and Mr. Trinidad didn't get an attempt to say on the record that this never occurred. And so, for that reason, on these facts, I think the court should look into this and conclude that this was intimidation, and intimidation in this context does constitute an adverse action, does constitute an act of retaliation. I thank your honors. Thank you, Mr. Waterson. Just one, not related specifically to this case, but housekeeping detail. Would you be good enough, please, in due course, but ideally sometime today, just to double check with our clerk's office and make sure that the clerk's office here has your phone number? Okay, sure. That'd be great. Thank you very much. Thank you both, and we'll reserve decision in this case.